CHARLES J. PHALEN, Appellant, *v.* THE UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee under the Will of JAMES PHALEN, Deceased, et al., Respondents.

1. ANTE-NUPTIAL CONTRACT — PROVISION THEREOF, WHEREBY FATHER AGREED TO MAKE NO DISTINCTION BETWEEN HIS SON AND OTHER CHILDREN IN THE DISTRIBUTION OF HIS ESTATE BY WILL — WHEN THE SON MAY ENFORCE THE CONTRACT BY ACTION IN EQUITY. Where it was provided in formal marriage articles entered into by a father with his son and other interested parties, in contemplation of the marriage of the son, which took place a few days later, that the father should make no distinction between his children in the distribution of his estate by will, and the father subsequently died leaving a will whereby he carried out the agreement contained in the marriage articles, but by a codicil, executed a short time before his death, directed that the portion of his residuary estate, which he had bequeathed absolutely to the son, should be held in trust, the income thereof to be paid to such son during his life and upon his death the principal to go to his heirs at law, the corresponding portions of the residuary estate being given absolutely to the other children of the testator, the son, after the probate of the will and codicils and the final decree settling the estate and distributing it in accordance with the directions contained in the will and codicils, may maintain, against the trustees under his father's will, an action for the specific performance of the marriage contract, although he did not object to the probate of the will and codicils, or the judicial settlement and distribution in accordance therewith.

2. SAME — FAILURE OF SON TO INTERPOSE OBJECTIONS TO FATHER'S WILL DOES NOT PRECLUDE MAINTENANCE OF ACTION TO ENFORCE ANTE-NUPTIAL CONTRACT. The contention, that if the ante-nuptial contract be held to be valid and enforceable, it will operate as a testamentary instrument which the son is precluded from enforcing because he interposed no objection to the probate of his father's will, is untenable, where the direct and only purpose of the agreement, plainly expressed, was to secure to the son an equal share with his sister in the distribution of his father's estate; since equity, if no good reason intervenes, will give effect to the expressed intention of the contract.

3. SAME — COMPLAINT IN EQUITABLE ACTION NOT DEMURRABLE BECAUSE ANTE-NUPTIAL CONTRACT WOULD NOT SUPPORT ACTION AT LAW. The complaint in the action to enforce the ante-nuptial contract is not demurrable as failing to state a good cause of action, because the contract would not support an action at law, since there are many contracts upon which an action at law cannot be maintained that are enforceable in equity.

4. SAME — VALIDITY OF CONSIDERATION OF ANTE-NUPTIAL CONTRACT. The contention that there was no consideration as between the father and son which would enable the latter to maintain an action to enforce the ante-nuptial contract is without force and cannot be sustained; such agreements are favored by the courts and have been upheld and enforced in equity whenever the contingency provided by the contract has arisen; furthermore, the son was a party to the agreement and performed on his part by the marriage to his wife; he had a legal interest in the complete execution of the contract, and the father having failed to perform the agreement to give the son the same share as that given to his sisters, the son can compel performance of the contract unless some good reason is made to appear why he should not be permitted to do so.

*Phalen* v. *United States Trust Co.*, 108 App. Div. 365, reversed.

(Argued May 1, 1906; decided October 9, 1906.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 25, 1905, which affirmed a final judgment dismissing the complaint herein entered upon an order of said Appellate Division, which reversed an interlocutory judgment of Special Term overruling a demurrer to the complaint and sustained such demurrer.

This action was brought by the plaintiff, Charles James Phalen, to enforce specific performance of formal marriage articles entered into in the city of Paris, France, on August 7th, 1873, in contemplation of the plaintiff's marriage to Julia de Zakrevsky, the daughter of a Russian nobleman. The parties to such articles were the plaintiff, his father and mother, his intended bride and her father. His father, the testator, James Phalen, covenanted and agreed in such articles, so far as material to the questions presented on this appeal, to make no distinction between his children in the distribution of his estate by will. The marriage contemplated by the articles took place a few days after their execution.

The plaintiff's father died in 1887. He left a will dated May 15th, 1882, whereby he carried out his agreements contained in the marriage articles. He subsequently executed various codicils thereto, none of which conflicted with the provisions of the articles, except the seventh and last. By that

codicil the testator directed that the portion of his residuary estate which he had bequeathed to the plaintiff absolutely should be held in trust, the income thereof to be paid to him during his life, and upon his death the principal was to go to his heirs at law. The testator had, however, given corresponding portions of his residuary estate to his other children absolutely.

The will and codicil were thereafter admitted to probate. An accounting was had by the executors, upon which the plaintiff duly appeared, interposed objections, but subsequently withdrew them. A final decree was thereafter entered distributing the estate in accordance with the directions contained in the will and codicils, and not according to the marriage articles.

The foregoing are, substantially, the material facts set forth in the complaint. The defendant trust company, as trustee under the will of the testator, interposed a demurrer to the complaint upon the ground, among others, that it did not set forth facts sufficient to constitute a cause of action. The demurrer was overruled at the Special Term, but sustained by the Appellate Division.

*Alexander R. Gulick* and *Frederick S. Woodruff* for appellant. The complaint states facts sufficient to constitute a cause of action. (*Colby* v. *Colby*, 81 Hun, 221; *Winne* v. *Winne*, 166 N. Y. 263; *Kine* v. *Farrell*, 71 App. Div. 219; *Parsell* v. *Stryker*, 41 N. Y. 480; *Edson* v. *Parsons*, 155 N. Y. 555; *Shakespeare* v. *Markham*, 10 Hun, 311; *Healy* v. *Healy*, 55 App. Div. 215.; *Gates* v. *Gates*, 34 App. Div. 608; *Godine* v. *Kidd*, 64 Hun, 585.) The plaintiff is entitled to the equitable relief demanded in the complaint. (*Winne* v. *Winne*, 166 N. Y. 263; *Van Camp* v. *Searle*, 147 N. Y. 150; *Husted* v. *Thompson*, 7 App. Div. 66; *Kine* v. *Farrell*, 71 App. Div. 219; *Colby* v. *Colby*, 81 Hun, 221; *Shakespeare* v. *Markham*, 10 Hun, 311; *Corscadden* v. *Haswell*, 88 App. Div. 158; *Galway* v. *M. St. R. Co.*, 128 N. Y. 132; *Treadwell* v. *Clark*, 73 App. Div. 473; *Kenyon* v. *National Life Ins. Co.*, 39 App. Div. 276.)

*Edward W. Sheldon* for respondents. The plaintiff is not entitled to the equitable relief demanded because no case for equitable interference is presented ; he had a complete remedy at law, and he has been guilty of laches in bringing his suit. (*Matter of Argus Co.*, 138 N. Y. 557 ; *Mahaney* v. *Carr*, 175 N. Y. 454 ; *Hamlin* v. *Stevens*, 177 N. Y. 39 ; *Ide* v. *Brown*, 178 N. Y. 26 ; *Winne* v. *Winne*, 166 N. Y. 263 ; *Andrews* v. *Brewster*, 124 N. Y. 433 ; *Porter* v. *Dunn*, 131 N. Y. 314 ; *Peck* v. *Vandemark*, 99 N. Y. 29 ; *Leahy* v. *Campbell*, 70 App. Div. 127 ; *Gall* v. *Gall*, 27 App. Div. 173.)

WERNER, J. We think the complaint sets forth a good cause of action in equity. To hold otherwise we would have to overturn principles of law and equity that have been recognized and established for centuries.

Ante-nuptial contracts, whereby the parents of the parties about to marry have agreed to settle property upon one or both of the spouses, either upon the performance of the marriage ceremony or by testamentary devise or bequest, are of such frequent occurrence, especially in England, that they form a distinct class in the body of our law. For the purposes of this discussion we may assume that this action could not be maintained at law, although there is very respectable authority to the contrary in England, where actions at law have been maintained even upon informal agreements of this nature. (*Shadwell* v. *Shadwell*, 30 L. J. [C. P.] 145 ; 9 C. B. [N. S.] 159 ; *Douglas* v. *Vincent*, 2 Vernon, 201.) One of the very purposes of equity is to aid where the law fails. In the determination of this appeal it should be borne in mind that a court of equity will take into consideration the facts and circumstances appearing when the case is tried. If it should then appear that the plaintiff's habits are such as to endanger the safety of the fund which he claims, and that its transmission to him might deprive his wife and children of proper means of support; or if for any other good reason a court of equity might deem it unfair, inequitable or unjust that specific performance of the contract in suit should be decreed, a wise

judicial discretion would, of course, be interposed to withhold a decree, the effect of which would be to defeat the very object for which the contract was made. A court of equity can always mould its decrees so as to measure out justice to all concerned, and the question whether specific performance will or will not be decreed in a given case is always addressed, in the first instance, to the sound judicial discretion of the court whose aid is invoked. (*Seymour* v. *De Lancey*, 6 Johns. Ch. 222; *Margraf* v. *Muir*, 57 N. Y. 155; *Day* v. *Hunt*, 112 id. 191; *Conger* v. *N. Y., W. S. & B. R. R. Co.*, 120 id. 29; *Stokes* v. *Stokes*, 155 id. 590.) And it is usually a question that must be decided in the light of the facts and circumstances existing at the time of the trial, so that it can rarely be disposed of upon a demurrer to a complaint.

It is suggested that if we should give effect to the antenuptial contract formally drawn up and signed by the plaintiff and all other parties in interest, we would be treating it as a testamentary instrument which the plaintiff is, in some unexplained way, precluded from enforcing because he interposed no objections to the probate of his father's will. We think there is no force in this contention. Such agreements have been upheld for hundreds of years, although their ultimate effect is usually to change the current of attempted testamentary disposition of estates. The direct, and, indeed, the only, purpose of this agreement, plainly expressed, was to secure to the plaintiff an equal share with his sisters in the distribution of his father's estate. That was the end in view, and equity, if no good reason intervenes, will give effect to the expressed intention. The principle upon which such agreements are sustained was stated by Lord CAMDEN as early as the year 1769, in *Durfour* v. *Ferraro* (Hargrave's Jurid. Arg. 304), and it was not then new. That was a case of mutual wills, in which the learned jurist said (p. 309): " Though a will is always revocable, and the last must always be the testator's will, yet a man may so bind his assets by agreement that his will shall be a trustee for performance of

his agreement. A covenant to leave so much to his wife or daughter, etc.  * * *  These cases are common; and there is no difference between promising to make a will in such a form and making his will with a promise not to revoke. This court does not set aside the will, but makes the devisee, heir or executor, trustee to perform the contract.  * * * No man shall deceive another to his prejudice. By engaging to do something that is in his power, he is made a trustee for the performance, and transmits that trust to those that claim under him. This court is never deceived by the form of instruments. The actions of men here are stripped of their legal clothing, and appear in their first naked simplicity. Good faith and conscience are the rules by which every transaction is judged in this court; and there is not an instance to be found since the jurisdiction was established where one man has ever been released from his engagement after the other has performed his part."

We deem it unnecessary to discuss the intermediate cases which have fully and firmly established the principle that a man's representatives shall be trustees of a resulting trust for the benefit of those to whom he has bound his estate by such a contract as is here involved, for we consider the comparatively modern case of *Johnston* v. *Spicer* (107 N. Y. 185) decisive of this whole controversy. In that case the husband by an ante-nuptial contract had provided that in case of his death without issue all his property should belong to the lady whom he was about to marry. The parties intermarried and the husband predeceased the wife intestate and without issue. This court held that by virtue of the contract the husband's estate went to the heirs of the wife, and speaking through RUGER, Ch. J., said: " It has been the constant practice of the courts of this country, as well as of England, to enforce ante-nuptial agreements according to their terms, whether they relate to existing or after-acquired property, and to decree a specific or substituted performance of them according to the nature of the case (citing authorities). * * * The suggestion that such contracts may be invalid,

as being of a testamentary character and as contravening the statute regulating the execution of wills is of no force in view of the fact that for many centuries they have been sanctioned and protected by the courts, and their validity in this state has been expressly ratified and approved by statutory provisions. (Laws of 1848, chap. 200, § 4; Laws of 1849, chap. 375, § 3.)" To the same effect are numerous other cases in this state, and they are all based upon the principle that although a contract may contain covenants to leave property by will, that is no reason why it should not be performed. The facts of those cases are too voluminous and various for repetition here, and a few of them are cited merely to show how firmly the principle is established. (*Parsell* v. *Stryker*, 41 N. Y. 480; *Stanton* v. *Miller*, 58 id. 192; *Shakespeare* v. *Markham*, 72 id. 400; *Winne* v. *Winne*, 166 id. 263; *Gall* v. *Gall*, 64 Hun, 600; *Gates* v. *Gates*, 34 App. Div. 608.)

Neither do we subscribe to the proposition that this complaint does not state a good cause of action, because the contract which it sets forth may be one which would not support an action at law. There are many contracts upon which an action at law cannot be maintained that are enforceable in equity. "There are agreements which the common law, by virtue of its own doctrines, irrespective of statutory regulation, treats as invalid, as not contracts, and for which it furnishes no remedy; but which equity, in the application of its conscientious principles, considers as binding, and enforces by awarding its relief of a specific performance." (Pomeroy on Specific Performance, § 31.) In *Sprague* v. *Cochran* (144 N. Y. 104) this principle was applied to take a case out of the operation of the Statute of Frauds, and to the same effect is *Smith* v. *Smith* (125 N. Y. 224). Many more cases might be cited to illustrate the rule that equity decrees performance of just contracts which are not enforceable at law, but this axiomatic fact needs no further demonstration.

We now pass to that phase of the discussion in which it is argued that there was no consideration as between father and son which enables the latter to maintain an action to enforce

the agreement. In support of this position there are cited some recent cases in this court, founded upon oral agreements to devise or convey estates in consideration of services rendered to, or benefits actually received by, the promisors, who died without having carried out their respective parts of the several agreements. Such contracts have been held at least open to suspicion and courts are very reluctant to enforce them. (*Gall* v. *Gall*, 138 N. Y. 675 ; *Mahaney* v. *Carr*, 175 id. 454 ; *Ide* v. *Brown*, 178 id. 26.) But there is a very wide distinction between those cases and the case at bar. This action is founded upon what are known as formal marriage articles whereby certain property is settled or agreed to be settled upon either one or both of the spouses about to be married. Instead of being frowned upon, such agreements are favored by the courts and have been upheld and enforced in equity whenever the contingency provided by the contract arose. (*Johnston* v. *Spicer*, 107 N. Y. 185.) "They usually proceed from the prudence and foresight of friends or the warm and anxious affection of parents ; and, if fairly made, they ought to be supported according to the true intent and meaning of the instrument by which they are created. A court of equity will carry the intention of these settlements into effect, and not permit the intention to be defeated." (2 Kent's Comm. 165.)

It may be conceded that when the elder Phalen made his will he complied with the terms of the contract, in so far as it related to a testamentary provision for the wife and children of the plaintiff, but he did not perform his agreement to give to the plaintiff the same share as his two sisters, and the facts thus far disclosed suggest no reason why a court of equity should not compel complete performance at the suit of the son. He was a party to the agreement and performed on his part by the marriage with his wife. He had a legal interest in the complete execution of the contract and, under principles now well settled, he can compel performance unless some good reason is made to appear why he should not be permitted to do so.

It is the rule, both in law and equity, as was held in *Borland* v. *Welch* (162 N. Y. 104), that such agreements cannot be enforced by mere volunteers or strangers to the consideration. In that case collateral relatives of the wife sought to claim under a marriage settlement made between the husband and wife and trustees, and it was held that they were mere volunteers. But there Judge CULLEN referred to the rule, subscribed to by this court, that even a person not a party to such a contract may compel performance if it has been made for his benefit. In one case it was held that the relation of parent and child (*Todd* v. *Weber*, 95 N. Y. 181), and in another husband and wife (*Buchanan* v. *Tilden*, 158 N. Y. 109), was sufficient consideration to support the action. It is not necessary to go so far in this case. Here the plaintiff was not only within the "influence of the consideration," as it was called, but was actually a party to the contract. In *Borland* v. *Welch* (*supra*) Judge CULLEN quotes with approval the general rule laid down in Atherly on Marriage Settlements (p. 125): "Equity will execute marriage and other family settlements at the instance of all persons who are within the influence of the marriage consideration, for all these rest their claims on the ground of a valuable consideration." This statement of the rule was concurred in by all the members of this court then sitting, and we regard it as entirely sound in principle. The strict legal definition of consideration need not here be discussed, since marriage settlements have always been regarded as exceptions to the general rule upon this question. " Articles for settlements in most cases stipulate for benefits to persons other than parties to them. The frequent use of such stipulations during the past two centuries, and the number of cases in which benefits stipulated for have been secured by the courts to those for whom they were intended, show that both conveyancers and judges have relied on and assumed their validity generally. Yet they are obnoxious to a general rule of law and equity, and depend for their efficacy on exceptions from that rule made in favor of them, and upon a doctrine of equity the scope of which

has hardly yet been accurately determined." (Vaizey's Law of Settlements, vol. 1, p. 140.)

The question as to what persons are within the consideration of the agreement in this class of cases has frequently arisen, but it has never been doubted that the parties whose marriage forms the occasion of the agreement are within the consideration and entitled to enforce the contract. Even the issue of such marriage may enforce such an agreement, although they may not be born at the time it is made. (*Gale* v. *Gale*, L. R. [6 Ch. D.] 144, 148.) "The promise of a third party may be for the wife's benefit, or it may be for the mutual benefit of the married parties, and enforceable accord-' ingly." (Schouler's Domestic Relations, § 178.) Actions at law have even been sustained upon mere letters to the party about to marry and at his suit, although the only consideration was the marriage. In *Shadwell* v. *Shadwell* (30 L. J. [C. P. 1860] 145; 9 C. B. [N. S.] 159) the defendant's testator wrote to his nephew, the plaintiff, as follows: "My dear Lancey.— I am glad to hear of your intended marriage with Ellen Nicholl, and, as I promised to assist you at starting, I am happy to tell you that I will pay to you one hundred and fifty pounds yearly during my life, and until your annual income derived from your profession of a Chancery barrister shall amount to six hundred guineas, of which your own admission will ·be the only evidence that I shall receive or require." In an action by the .nephew to recover, after his marriage with the lady named, the arrears of the annuity promised he was permitted to recover at law. In the case of *Coverdale* v. *Eastwood* (L. R. [15 Eq.] 121), after proposals of marriage had been accepted, the lady's father wrote to the intended husband as follows: "V. being my only child, of course she will come into possession of what belongs to me at my decease." In other letters he made statements evidencing the same intention. The father, being then a widower, subsequently remarried. Upon his death he left a will bequeathing part of his estate to his widow and creating certain annuities. Upon a bill filed by the daughter for the enforcement

of this contract, it was held, notwithstanding the manifest equities of the widow, that the daughter was entitled to the whole estate. This, as Mr. Schouler says, is a harsh case. Similar informal agreements have been enforced many times in England. (*Douglas* v. *Vincent*, 2 Vernon, 201; *Wankford* v.·*Fotherley*, Id. 322; *Moore* v. *Hart*, 1 id. 201.)

The foregoing principles and authorities seem to completely dispose of this case, and the discussion might well close at this point, but there are a few authorities which need only to be cited to show that covenants in marriage settlements, such as the one here in question, binding the parent to leave to a child all or an aliquot part of his property at death, are most usual in such settlements, and have always been sustained. *Laver* v. *Fielder* (32 Beav. 1) presented the same general features as those in the case at bar, except that the agreement was informal and the plaintiff was not a party thereto. It was contained in a letter by the father to the prospective son-in law in which he promised that " at my decease she (the daughter) shall be entitled to her share of whatever property I may die seized." The father, in making his will, failed to comply with this agreement, and after a suit by the widow and a son to settle the estate, the daughter was permitted to maintain an action for the enforcement of the agreement and judgment was decreed in her favor. In *Jones* v. *Martin* (3 Anstr. 822; more fully reported in 5 Ves. 266, note) the father covenanted on his daughter's marriage to leave her at his death an equal share of personalty with his son. The father in his lifetime transferred certain property to his son which was more than the latter's proportion as fixed by the marriage settlement. In an action brought after the parent's death by the daughter and her husband for an accounting and an enforcement of the agreement, judgment was rendered for the relief asked. It was held in the House of Lords that " The contract was stated by counsel for the respondent to be vague, and idle, unmeaning and insecure. It is not, however, an unusual covenant in settlements; many marriages are entered into on such covenants; and they are not inexpedient. They are entitled to

favourable consideration.   *   *   *   But then it does not con-
fine or restrict the father's powers.   He may alter the nature
of his property from personal to real; or he may give scope
to projects; or indulge in a free and unlimited expense.   But
he must not be allowed to entertain more partial inclinations
and dispositions towards one child than another."   In *Bennett*
v. *Houldsworth* (L. R. [6 Ch. Div.] 671) the father, by a set-
tlement prior to the marriage of his daughter, covenanted that
he would, by his will, divide his estate into as many equal
parts as he had children, one of such parts for the benefit of
his daughter and her husband, remainder to their issue.   He
failed to carry out the provision for this settlement.   In an
action by the trustees of the settlement, the agreement was
held binding.   In that case the vice-chancellor said: " The
settlement is, in my opinion, in very plain terms.   It does
entitle the parties under the settlement to have one equal
fourth part of the whole of the testator's estate applied
upon the terms of the settlement, but it is only upon the
terms of the settlement.   The representative of the trus-
tees of the settlement, who asks by this suit to have the
trusts of that deed carried into execution, does not ask for
the payment of any debt, but asks that the fourth part
may be ascertained, and that it may be paid to him in
satisfaction of the obligation contained in the settlement.
In my opinion, that is a claim which cannot be resisted."   To
the same effect is *McCarogher* v. *Whieldon* (L. R. [3 Eq.]
236).   Again, in *Willis* v. *Black* (4 Russ. 170), the father
covenanted upon the marriage of his daughter to settle upon
her and her husband, among other things, as great a share of
his property as he should by his will or otherwise provide for
any of his younger children.   That agreement was enforced
after the father's death at the suit of the trustees of the set-
tlement.  (*Romaine* v. *Onslow*, 24 Wkly. Rep. 899.)   In
*Keays* v. *Gilmore* (Irish R. [8 Eq.] 296) the father, in a letter
to a cousin, promised, upon the marriage of his son, to give to
his son upon the father's death a child's portion of his estate.
An action was maintained by the son's wife as his executrix

for a construction of the agreement and its validity was sustained, and within the past year the Irish Court of Chancery (*Doyle* v. *Crean*, 1 Irish R. [1905] 252) gave effect to a contract almost exactly similar in its terms. The father, by a settlement made upon the marriage of his daughter, agreed to distribute his estate equally among his children. An action was maintained by the trustees of the settlement on behalf of the daughter without question as to the daughter's right to insist upon the performance of the agreement. Other cases illustrating the general principle are *Eardley* v. *Owen* (10 Beav. 572) and *In re Brookman's Trust* (L. R. [5 Ch. App.] 182). These cases disclose how uniformly such agreements have been sustained by the courts.

Since the demurrer was not taken on the ground that the plaintiff's wife was a necessary party, that question is not now before us. It may be that if the case should come to trial, she ought to be brought in as a party so that the rights of all persons in interest may be properly presented and disposed of. Specific performance ought not to be decreed unless all proper parties are before the court. (*Miller* v. *Bear*, 3 Paige Ch. 466.)

The order of the Appellate Division sustaining the demurrer should be reversed, and the interlocutory judgment of the Special Term overruling the demurrer affirmed, with costs in all courts, with leave to defendant to withdraw demurrer and serve answer within twenty days upon payment of costs.

O'BRIEN, J. (dissenting). This is an action for specific performance of an alleged contract claimed to have been made between the plaintiff and his father. The father was a citizen of New York, but for many years prior to his death he resided with his family in Paris. He died in that city on the 20th of January, 1887, leaving a will executed there, to which was attached seven codicils, the last or seventh of the codicils having been executed on the 17th of January, 1887, a few days prior to his death. By this will and the codicils attached the testator disposed of a large estate, both real and personal,

to his widow and children. The will and codicils were admitted to probate in this state, the plaintiff being a party to the proceedings for that purpose before the surrogate. By the last codicil the testator disposed of that portion of his property which had been left by the prior provisions of the will to the plaintiff in trust to the defendant to pay the income thereof annually or at convenient intervals in each year to or for the use and support of the plaintiff during his life, and at his death the said trust should cease and the principal and any unpaid portion of the income of the fund was to go and be divided among his heirs at law. By the prior provision of the will and codicils, after providing for the widow, the testator devised the remainder of his estate in substantially equal shares to his children, and thus by the last codicil these provisions as to the plaintiff were changed into a life estate with remainder to the plaintiff's heirs.

The estate was distributed by the executors in conformity with the provisions of this testamentary instrument. An intermediate accounting was had and a final judicial accounting and settlement subsequently, in which full distribution was made according to the terms of the will, and the executors were discharged from their trust. The controversy in this case does not arise from any defect in the will, but from the transactions which took place many years prior to its execution and to the death of the testator. On the 11th of August, 1873, the plaintiff became engaged to be married to a lady who resided and was domiciled at Baden-Baden. The marriage was preceded by the execution of an ante-nuptial contract or settlement made by the plaintiff and his father and mother of the first part, and the intended wife, with her father and mother, of the second part. By this instrument the testator made some gifts of property to the plaintiff, including a house in Paris, but the main provisions of the instrument were obviously intended for the benefit of the wife. The only provision of the instrument that is of any importance in the present controversy is the following:

" And the said James Phalen and Catherine S., his wife, do

further respectively covenant and agree that they will make no distinction between their children as regards the proportion of their estates coming to each under their respective wills; account, however, being taken of any advance which may have been made to either during the lifetime of their said parents, the amount of which advance is in all cases to be deducted from the share to which such child would otherwise have been entitled."

The theory of this action is that inasmuch as the testator left the plaintiff's equal share, not absolutely to him, but in trust as before stated, that the provision of the marriage settlement was violated, and hence conferred upon the plaintiff a right of action for specific performance. The complaint sets out the will and codicil and the other writing referred to, and demands judgment for the following relief: (1) That the trust under the seventh codicil in the fund held for the plaintiff be declared to be created in violation of plaintiff's rights under his contract, and the plaintiff is entitled to the principal of his said fund held by the United States Trust Company. (2) That the trust under the seventh codicil be abrogated, and that the remainders in said fund given by the seventh codicil to the heirs of the plaintiff be extinguished, and that the plaintiff's two sisters, Florence and Catherine, and all other persons who may ever be his heirs at law be barred therefrom, and that it be declared that the United States Trust Company holds that fund under the will as modified by the first six codicils, and (3) that the trust company be directed to turn over all of said fund with the increment thereto and the accumulation thereof to the plaintiff. There are some other statements and exceptions in the prayer, but they have no bearing upon the case. The trust company was the only defendant that appeared in the action and it demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The trial court overruled the demurrer, but that judgment was reversed by the Appellate Division and the plaintiff has appealed to this court.

The first question that is naturally presented is the legal effect and nature of that provision of the ante-nuptial agreement which has already been quoted. It is impossible, I think, to classify it among any of the recognized methods for the devolution of property or the creation of any particular obligation. It is not a testamentary instrument of any kind, since it was not executed according to the laws that provide for the distribution of property to take effect after death. It was not a conveyance of any property whatever. It created no lien upon any of the testator's estate. It was neither an executed nor an executory contract. It will be seen that fourteen years had elapsed from the time that the marriage agreement was made until the testator executed the seventh codicil of his will, which it is claimed constituted a breach of contract and is clearly the sole reason for this action. If this theory of the case be correct it must follow that had the plaintiff, the son, developed in the meantime habits of extravagance or become otherwise improvident and incapable of taking care of a large estate, a contingency that actually happened, the testator had disabled himself from so changing his will as to make what might seem to him a proper disposition of the plaintiff's share under all the circumstances. It is argued that the testator, fourteen years before he executed the codicil, had so bound himself hand and foot that he was not at liberty to make what he thought to be a wise disposition of his property, simply because of his promise in the marriage agreement to make no distinction between his children. This proposition would seem to be so plainly contrary to good sense and to all our notions of law that the mere statement of it is sufficient to show its absurdity. Indeed, it is not attempted to sustain this action upon any principle of law or equity, or by arguments founded upon any rule of law or equity. What is claimed is simply this, that there are to be found among the adjudicated cases remarks to that effect by learned judges in the discussion of cases, but where, it will be seen, the question now before us was not involved. It is perfectly safe to say that in no case has it yet been decided that a man

13

who made a promise such as that contained in this case has disabled himself forever from making such a disposition of his property by will as seemed to him to be wise and judicious. A brief review of the cases cited in support of the complaint in this action will, I think, show that when they are fairly considered and analyzed they decide nothing that sustains the plaintiff in this case. The discussion in the opinions may be omitted. It will be sufficient to point out the questions that were actually involved and decided in the particular case.

The leading case cited and relied upon by the learned counsel for the plaintiff is that of *Parsell* v. *Stryker* (41 N. Y. 480). In that case a person let a farm to his grandson for the life of the former. The tenant was bound to occupy the place and do all the work and was to have two-thirds of the produce and the farm was to belong to the grandson on the death of the grandfather. It was subsequently agreed that the grandfather should make a will devising the farm to the grandson. It was held that an action for specific performance would lie for the performance of this agreement. Here the grandson went into possession and occupancy of the farm under a promise that it should belong to him at the death of the grandfather. The court decreed specific performance and the conveyance to the grandson by the defendants in the action, to whom it had been subsequently conveyed by the grandfather in violation of the agreement. That case has little, if any, bearing upon the case at bar. The fact that the grandson, on the faith of the promise, went into possession and occupancy of the farm and worked it, yielding a portion of the products to the lessor, was sufficient to confer upon a court of equity jurisdiction to decree specific performance. The promise to leave the farm to the grandson by will was of no consequence. A verbal agreement to give it upon the death of the owner would be sufficient when accompanied by possession. In fact, that is just what was decided in the case of *Freeman* v. *Freeman* (43 N. Y. 34). In a court of equity the grandson's case was just as strong without any promise to make a will as it was with a promise.

That was a circumstance wholly immaterial to the right of action. It was the possession and occupancy of the farm by the grandson under a promise that his grandfather would give it to him that constituted the equitable claim of the plaintiff, and so it will be seen that the case decides nothing that can aid the plaintiff here.

*Edison* v. *Parsons* (155 N. Y. 555), cited in behalf of the plaintiff, was a controversy arising out of an alleged agreement between sisters to make mutual wills. On the trial the complaint was dismissed and the judgment was affirmed in this court. The case decides nothing that bears upon the nature or legal effect of the promise, which is the foundation of this action.

In *Winne* v. *Winne* (166 N. Y. 263) there was an agreement between the mother of a boy and the deceased. The deceased was to have, and the mother of the plaintiff was to surrender to her the custody and control of the plaintiff. The deceased was to maintain him as her own child, and at her death give him all her property and make him her sole heir, and his mother was to have nothing more to do with him. This agreement was completely carried out and executed, but the deceased died intestate, and the boy, or his representatives, claimed the property owned by the deceased at her death. The latter left no father, mother, child nor descendant, and no child was born to her after such contract was made. The court decreed specific performance so far as to declare that the property belonged to the plaintiff. This court, however, was careful to add at the end of the opinion this paragraph : " While we are of the opinion that specific performance of this contract was properly awarded, this decision is based solely upon the findings of the trial court and the particular facts and circumstances of this case. Yet, it must not be regarded as an authority for maintaining such an action under different circumstances or upon other proof, as the granting or denial of such relief always rests in the sound discretion of the court, and should be denied unless the agreement is fair and just, and its enforcement equitable." It is

hardly necessary to add that in the case at bar it is sought to maintain the action under very different circumstances, and under the language of the opinion just quoted it can have no application to this case.   These are the cases cited in behalf of the plaintiff from this court.  There are numerous cases cited from the Supreme Court which call for a brief review.

*Shakespeare* v. *Markham* (10 Hun, 311) assumed the form of an accounting before the surrogate to recover from the estate of a deceased person a large sum of money claimed to be due the contestant for services rendered and for taking care and for supporting the testator in his old age under an expectation of receiving a legacy from him.   The testator died without having made any testamentary provision in favor of the contestant.   In the Surrogate's Court the claim was allowed, but the determination was subsequently reversed upon appeal and the reversal was affirmed in this court.   (72 N. Y. 400.)   Just why that case is supposed to be an authority in favor of the plaintiff in the case at bar it is quite difficult to see.

*Colby* v. *Colby* (81 Hun, 221) was a case where there was a mutual promise of marriage between the parties, and the learned trial judge held that it was an authority in support of this action.   It is stated in the case that the deceased made a proposition of marriage, which she accepted, and that thereupon an agreement in writing was made and subscribed by the parties, by the terms of which it was mutually agreed that the two should be presently married, and that the plaintiff should live with the defendant at his residence and be a faithful and loving wife to him as long as he should live, and if the plaintiff should survive him she should have the said premises as her own in fee simple absolute; and that in pursuance of the terms of said contract and in part performance of said agreement the said Colby executed and published his will in due form of law by which he devised to the plaintiff, her heirs and assigns forever, the whole of said premises, and he agreed that he would not revoke or alter the will.   The marriage took place according to this agreement and the parties lived together

as husband and wife until the death of the husband on the 10th day of March, 1894. Now, here was an agreement in the nature of an ante-nuptial settlement between husband and wife, whereby the wife was to have in case she survived her husband certain specific real estate. It appeared that the husband, before his death, executed and published another and different will, whereby he undertook to revoke the one made prior to the marriage. It appeared that the widow was in possession of the premises, claiming to be the owner under the contract and demanded specific performance. It was held that she had a good cause of action, but it is obvious that the promise not to revoke the will had little, if anything, to do with her rights. The ante-nuptial agreement followed by the marriage, and the possession by the wife after her husband's death, gave her an equitable claim to the property which a court of equity would, of course, enforce. Suppose the husband had not revoked the will at all, but it had been set aside by reason of some defect in the execution or of undue influence or incapacity or other cause; this would not affect the rights of the wife in the slightest particular. She would still, in virtue of the marriage contract and the marriage and her possession, have good title in a court of equity. So that we see that the promise not to revoke the will was in legal effect wholly immaterial. The case furnishes no support for the present action. Other cases cited upon the brief of the plaintiff's counsel are equally wide of the mark. None of them decide anything that tends to sustain the plaintiff in this case. It is said, for instance, that the case of *Johnston* v. *Spicer* (107 N. Y. 185) sustains the plaintiff's contention. I am unable to see that it has any application whatever. The proposition decided in that case was this: Ante-nuptial contracts intended to regulate and control the interest which *each of the parties to the marriage* shall take in the property of the other during coverture or after death are favored by the courts and will be enforced in equity according to the intention of the parties. No one disputes that proposition. But there is no question in this case between the parties to the marriage.

There is no question here with respect to any property as between the husband and wife. The sole question here is whether there was a valid contract between the father and the son, whereby the father bound himself not to make the codicil in question; whether there was a breach of the contract, and if there was, whether the plaintiff's remedy is by action for damages or suit for specific performance.

On the other hand there are three or four quite recent cases in this court that seem to me to be squarely against the plaintiff's contention. In *Gall* v. *Gall* (64 Hun, 600) a deceased person had promised that if the plaintiff, then residing in California, would go to live with him in New York he would make a will in his favor. The deceased did make the will, but afterwards he married again and had issue. The action in that case, as in this, was for specific performance, and it was held that it could not be maintained, and that judgment was affirmed in this court. (138 N. Y. 675.)

*Mahaney* v. *Carr* (175 N. Y. 454) was a case that in its main features cannot be distinguished from the one at bar. It was an action by a grandchild against the representatives of her grandfather to compel the specific performance of an agreement that if the girl would make her grandfather's home her home and assume the duties of a daughter the deceased would give to her a child's share of his property upon his death, to wit, a one-fourth interest. The courts below sustained the action, but it was reversed in this court upon an opinion which seems to me to answer the argument of the learned counsel for the plaintiff in this case.

*Ide* v. *Brown* (178 N. Y. 26) is to the same effect. In that case the plaintiff, a young girl, whose father and mother had died, brought an action to enforce specific performance of an agreement on the part of the deceased to make a will in her favor vesting her with the title to a large amount of real and personal property. It was held that the action could not be maintained. Thus, it will be seen that instead of judicial authority to support this action the decisions of the courts are against it. It can, I think, be safely asserted that there is no

case in this state that decides that a promise such as the plaintiff relies upon in this case can be made the subject of specific performance in a court of equity or even of an action at law.

But perhaps the most conclusive argument and authority against the plaintiff's contention is to be found in the history of this very case. It seems that after the probate of the will and codicil the plaintiff filed a petition with the surrogate of New York to revoke the last codicil on the ground of fraud and undue influence.

The question of the validity of this codicil was tried at great length before the surrogate, and he held that the codicil was valid and dismissed the petition. On appeal to the Supreme Court the question was again fully argued and heard and that court unanimously affirmed the decree of the surrogate. An appeal was taken to this court and the decision of the courts below was unanimously affirmed *on the opinion below.* (*Matter of Phalen,* 47 N. Y. S. R. 44; affd., 140 N. Y. 659.) The court found, as will be seen from the opinion, that the plaintiff had separated from his wife and was incompetent to manage property by reason of bad habits. All this took place nearly fifteen years ago, and several years after the father's death. Now, if it be true, as asserted upon this appeal, that the father had bound himself by a valid contract between himself and the plaintiff not to make the codicil in question, and it was made in violation of the rights of the son, it was, as between the son and the estate, simply invalid and void and should have been canceled and revoked. The legal effect of the decision is that the testator had the right and the power to make the codicil which constitutes the sole complaint of the plaintiff, and the testamentary power and capacity of the father was in no wise restricted in law by anything contained in the so-called contract upon which the present action was based. It cannot be supposed that this court and the court below would declare valid a testamentary instrument made in violation of a binding contract. The question then before the court is the same question now presented, namely, the right of the father to alter his will and make such

disposition of his property as he thought best, and it cannot be doubted that he acted wisely in thus protecting the son from the result of his own improvidence. It would, in our judgment, be very unwise to reopen the controversy now, fifteen years after it had been settled by the court and after the estate had been distributed and the executors discharged. The case in its general aspects does not seem to be so meritorious as to warrant such a result, and I venture to say that not a single case can be found in this state where such an action was sustained. If the testator had, by his promise in the marriage contract, disabled himself from changing his will, then why, it may be asked, did this court hold the last codicil valid ?

Passing from the question of the nature and validity of the promise in question, there are two other points that should be stated. If the promise set out in the complaint is a contract or binding obligation, it certainly must be supported by a sufficient consideration. It was a promise, in substance, that if the deceased made a will at all, it should be in a particular form, based upon the principle of equality between his children. Now, what consideration was there for the promise moving from the son to the father ? It is said that marriage is a good consideration ; and so it is between the parties, but it does not follow that it is a consideration for the promise of third parties. What did the son give the father that would constitute a consideration for the promise ? Nothing whatever. It is true that he afterwards married, but his father never requested him to marry and he never promised his father that he would. That was the plaintiff's own voluntary act. Did the plaintiff suffer any detriment in consequence of his father's promise ? Certainly not, unless we are prepared to hold that it is a detriment to a young man to marry, sufficient in the eye of the law to form a consideration for a promise on the part of another. I assume that that proposition will meet with no favor from any direction. The deceased secured no benefit, pecuniary or otherwise, from the promise on his part, and the question returns again, what was the consideration

moving from the son to the father that supports this promise which is called a contract? If the son had refused to marry and the father had sued him for specific performance, of course, such an action would be absurd, and yet a court of equity will not enforce a promise unless it is mutual. Both parties must be bound, and if both are not bound neither is bound. Consideration is the important element of a contract and must not be confounded with motive, which is not the same thing as consideration. The latter means something which is of value in the eye of the law moving from the plaintiff, either of benefit to the plaintiff or of detriment to the defendant. It is the price or matter of inducement to the contract, whether it be the compensation that is paid or the inconvenience that is suffered by the party from whom it proceeds. (Bouv. Law Dict. 401.) Chancellor KENT thus defined consideration : " There must be something given in exchange, something that is mutual or something which is an inducement to the contract, and it must be a thing which is lawful and competent in value to sustain the assumption." (2 Kent's Com. 464.) So that the promise in this case is not supported by any consideration, and hence the deceased had the right at any time before his death to make such a disposition by will of his property as he thought best.

This is an action in equity. The character of the action is stamped by the relief demanded, and that has already been stated. Unless the complaint states facts sufficient to invoke the jurisdiction of equity, then it does not contain a good cause of action. The rule in such cases is this, " in case a plaintiff has the right to maintain an action at law, or a suit in equity, and he elects to bring a suit in equity, demanding only equitable relief, but fails to state sufficient facts in his complaint to constitute an equitable cause of action, and the defendant demurs on the ground that the complaint does not state facts sufficient to constitute a cause of action, the demurrer will be sustained, though the facts alleged are sufficient to constitute a legal cause of action ; and so, in case he elects to bring an action at law, demanding only legal relief,

but fails to state sufficient facts in his complaint to constitute a legal cause of action, and the defendant demurs on the ground that the complaint does not state facts sufficient to constitute a cause of action, the demurrer will be sustained, though the facts alleged are sufficient to constitute an equitable cause of action." (*Wisner* v. *Consolidated Fruit Jar Co.*, 25 App. Div. 362; *Edson* v. *Girvan*, 29 Hun, 422; *Swart* v. *Boughton*, 35 Hun, 281; *Willis* v. *Fairchild*, 19 J. & S. 405; *Fisher* v. *Charter Oak Life Ins. Co.*, 20 J. & S. 179; *O'Brien* v. *Fitzgerald*, 143 N. Y. 377.)

This must be the true rule in such cases, since by section 1207 of the Code, where the defendant does not answer, the plaintiff can have no judgment except that demanded in the complaint. The facts stated in the complaint in this case relate exclusively to the breach of an alleged contract between the plaintiff and his father. If, therefore, the plaintiff has any cause of action whatever, it is an action at law to recover damages for the breach. There are no facts stated that bring the case within the jurisdiction of any recognized department of equity. So that, in whatever aspect the case is considered, it must be held that the demurrer was well taken, and that the judgment should be affirmed, with costs.

CULLEN, Ch. J., WILLARD BARTLETT and HISCOCK, JJ., concur with WERNER, J.; O'BRIEN, J., reads dissenting opinion, and HAIGHT and VANN, JJ., concur in result thereof.

Ordered accordingly.